***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, except for minor modifications, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. Defendant-employer is a duly qualified self-insured with Specialty Risk Services as the servicing agent.
3. An employee-employer relationship existed between the parties at all relevant times.
4. Plaintiff sustained an admittedly compensable injury to her left shoulder on July 28, 1999 as a result of which defendant filed a Form 60.
5. Plaintiff's average weekly wage is $266.00, yielding a compensation rate of $177.34.
6. The parties stipulated to the following documents which were received into evidence:
 (a) Pre-trial agreement was admitted as stipulated exhibit 1.
 (b) A set of stipulated pleadings was admitted as stipulated exhibit 2.
 (c) A set of medical records was admitted as stipulated exhibit 3.
7. Plaintiff contends the contested issues to be tried by the Industrial Commission are as follows:
 1) Did plaintiff suffer a compensable injury to her neck and mental condition as a result of the accident which occurred on July 28, 1999?
 2) Did the accident, the disability resulting therefrom, or the actions of the rehabilitation specialist cause, aggravate or accelerate plaintiff's mental health condition?
 3) Was suitable work offered to plaintiff by defendant?
 4) Is plaintiff in need of additional medical treatment?
5) To what benefits is plaintiff entitled?
 6) Should defendant be ordered to pay penalties and/or attorney's fees?
8. Defendant contends the contested issues to be tried by the Industrial Commission are as follows:
 1) Are plaintiff's alleged neck, back and psychological conditions causally related to the July 28, 1999 accident?
 2) Has plaintiff received all compensation to which she is entitled?
 3) Did plaintiff unjustifiably refuse to abide by her physician's recommendations and accept suitable employment offered by defendant-employer?
 4) Does plaintiff's refusal to return to suitable employment bar her claim for further benefits?
 5) Did defendant properly deny a portion of plaintiff's claim and as such, does plaintiff's request for fees and sanctions constitute unfounded litigiousness?
 ***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner with some modifications and finds as follows:
 FINDINGS OF FACT
1. At the time of the admittedly compensable injury to her left shoulder, plaintiff was a sixty-two year old female employed as a cashier. Plaintiff's primary job duty was to use the register to check out customers by scanning merchandise codes.
2. On July 28, 1999, a customer came to plaintiff's check-out line with a large box in a shopping cart. The customer left the shopping cart momentarily, and the box fell onto plaintiff, striking her on the left side of her body where the neck meets the shoulder and, in addition, scraping her right arm. It was determined after the accident that the box contained an entertainment center.
3. Prior to the accident, plaintiff had worked for employer-defendant for approximately one and one-half years as a cashier. Plaintiff's previous work experience included working as a bookkeeper, a hotel desk clerk, and a waitress. Her educational level is limited to the tenth grade.
4. In approximately 1985, plaintiff sustained an injury to her neck which required a laminectomy and fusion at C5-6 and 7. Plaintiff was not receiving treatment for this condition on July 28, 1999 and had not sought treatment for this condition since February of 1997.
5. At the time of the accident, plaintiff felt a pulling sensation on both of her shoulders, and pain in her neck and left shoulder. She heard a tearing sound in her left shoulder. Plaintiff reported this accident immediately to the personnel manager and completed an accident report on July 29, 1999 which indicated plaintiff was experiencing pain in her upper neck and shoulders. Defendant accepted the claim as compensable by filing a Form 60.
6. Plaintiff presented to Jamestown Emergicare on July 31, 1999 with contusions to both biceps and spasms in her neck. After several visits to Jamestown Emergicare and being in and out of work pursuant to doctor's orders, plaintiff was referred to an orthopedic surgeon.
7. On August 18, 1999, plaintiff was examined by Dr. Mark Warburton at High Point Orthopedics. At this time, plaintiff complained of discomfort in her shoulder, arm and neck. On examination, Dr. Warburton found plaintiff had markedly decreased range of motion in her neck with practically no extension and a lot of swelling of the arm. Dr. Warburton put plaintiff in an immobilizer, prescribed medication and wrote her out of work.
8. On September 9, 1999, Dr. Warburton ordered an MRI of plaintiff's shoulder which indicated a full-thickness rotator cuff tear. Dr. Warburton performed open repair surgery to plaintiff's left rotator cuff on October 13, 1999. Following the surgery, plaintiff continued to complain of pain, and on November 16, 1999, Dr. Warburton recommended physical therapy.
9. Plaintiff continued in physical therapy until January 28, 2000 when she was discharged due to a plateau in progress.
10. On February 1, 2000, plaintiff presented to High Point Regional Rehab Center for evaluation by an inter-disciplinary team for possible entry into the pain management program. Dr. John Goeke, a psychologist, performed a psychological evaluation as part of the team evaluation. Dr. Goeke diagnosed plaintiff with pain disorder, major depressive episode, and possible medication abuse. Dr. Kathleen Barfoot, a specialist in physical medicine rehabilitation, performed a medical evaluation and diagnosed chronic shoulder pain with fairly marked accompanying myofascial pain syndrome. The team recommended that plaintiff be evaluated by Dr. Thomas E. Lauer, a psychiatrist, for emotional distress and pain medication detoxification. The team also recommended that plaintiff participate in a pain management program which would include medical monitoring, prescription medication, outpatient physical therapy and outpatient cognitive-behavioral therapy.
11. On February 25, 2000, Dr. Lauer recommended that plaintiff receive assistance in getting off opiate medication prior to entry in the pain management program and that plaintiff receive treatment for her depressive symptoms.
12. Plaintiff returned to Dr. Warburton for follow up on February 28, 2000. Dr. Warburton diagnosed post rotator cuff repair adhesive capsulitis and recommended a manipulation of her shoulder. He also recommended cervical spine films and an EMG to rule out radiculopathy; however, these tests were not authorized by the carrier.
13. On March 2, 2000, plaintiff was admitted to High Point Regional Hospital and Dr. Warburton performed manipulation of her shoulder. On March 3, 2000, plaintiff was voluntarily admitted to the chemical dependency unit to receive psychiatric treatment and for detoxification under the direction of Dr. Lauer. Plaintiff was discharged from the unit on March 14, 2000.
14. After participating in the pain management pre-program, plaintiff subsequently entered the pain management program on April 3, 2000. During the program, plaintiff had group and individual therapy sessions under the direction of Dr. Goeke. Dr. Goeke found that plaintiff's mental status varied in large degree from day to day.
15. In the pain management program, plaintiff received more physical therapy. In addition, Dr. Barfoot prescribed medication and plaintiff received trigger point injections. On April 14, 2000, she was discharged from the program.
16. Plaintiff was seen by Dr. Warburton on April 17, 2000 and released to return to work with a ten pound weight lifting restriction.
17. On or around the end of April of 2000, plaintiff returned to work in the position of door greeter. In the position of a greeter, plaintiff was required to greet and acknowledge all customers with a smile as they entered the store, observe items the customers were bringing into the store and direct all returns to the return desk, direct customers to areas of the store upon request, monitor the entrance area for theft of merchandise, and offer customers a credit card application.
18. Plaintiff worked in the greeter job until approximately May 1, 2000 when she left work early. She saw Dr. Warburton on May 2, 2000. Dr. Warburton wrote plaintiff out of work for the remainder of the week and stated she could return to work the following week with a sitting restriction. On the same day, Dr. Warburton's assistant, in contradiction to Dr. Warburton's recommendation, wrote a note that plaintiff could return to work modified duty on May 3, 2000 and faxed said note to the rehabilitation case manager. Dr. Warburton scheduled an MRI scan of plaintiff's neck; however, this test was not authorized by the carrier.
19. As a result of the error of Dr. Warburton's assistant, plaintiff returned to work on May 3, 2000 for one day. During this shift, she was called into the office and was disciplined for allegedly allowing a customer to leave the store without paying for merchandise. Plaintiff contends the merchandise in question was a return.
20. On May 9, 2000, Dr. Barfoot took plaintiff out of work pending her appointment with Dr. Lauer on May 23, 2000 and completed an Industrial Commission Form 28U "Employee's Request That Compensation Be Reinstated After Unsuccessful Trial Return to Work." Defendant declined to reinstate benefits on the basis that the reason for the disability was plaintiff's psychological condition. Defendant also failed to file a Form 24 Application to Terminate or Suspend Payment of Compensation.
21. Dr. Goeke saw plaintiff on May 12, 2000 and found her to be decompensated. In Dr. Goeke's opinion, plaintiff would not have been able to work at that time. Dr. Goeke did not see plaintiff after May 12, 2000.
22. After the MRI recommended by Dr. Warburton was denied by carrier-defendant, plaintiff obtained authorization for the test from her group health insurance carrier. The MRI was conducted on May 18, 2000 and revealed abnormal findings.
23. On May 25, 2000 and May 26, 2000, plaintiff was seen at the Emergency Department of High Point Regional Hospital for severe pain.
24. Plaintiff saw Dr. Warburton on June 19, 2000. Dr. Warburton found plaintiff's emotional condition had worsened. He recommended that she follow up with Dr. Miller regarding her neck and that she might benefit from additional pain management treatment. Dr. Warburton released plaintiff from his care, and on July 6, 2000 assigned a 20% permanent partial impairment rating to her left shoulder. Dr. Warburton gave plaintiff permanent restrictions of no lifting over 10 pounds.
25. On June 23, 2000, Dr. Miller referred plaintiff to Dr. Victoria Neave, a neurosurgeon. Dr. Neave examined plaintiff on July 12, 2000 and ordered a myelogram which was performed on July 18, 2000. The myelogram showed, among other things, bilateral nerve root impingement at C4-5, left greater than right, and a large posterior osteophyte at C4-5. Dr. Neave recommended anterior cervical discectomy and fusion at C4-5 with bank bone and instrumentation which was expected to give plaintiff relief of symptoms in her forearms. Surgery was performed on July 25, 2000 by Dr. Neave. Dr. Neave's post-operative diagnosis was C4-5 spondylolisthesis with bilateral C5 nerve root impingement. The level on which Dr. Neave performed surgery was the level above plaintiff's previous surgery which was at C5,-6 and -7.
26. On August 16, 2000, plaintiff reported to Dr. Neave that she felt improvement since her neck surgery. Dr. Neave recommended that plaintiff begin to wean off the drug Neurontin.
27. Plaintiff's pain returned, and when she was seen by Dr. Neave's assistant on October 11, 2000, plaintiff was complaining again of problems with her left arm and fingers. Plaintiff was seen next by Dr. Neave's assistant on January 10, 2001 at which time she complained that her symptoms had returned in both arms. On January 17, 2001, Dr. Neave assigned plaintiff a 15% permanent partial impairment rating to her neck.
28. Dr. Lauer performed an evaluation of plaintiff on January 31, 2001. Dr. Lauer found that plaintiff continued to suffer from major depression with minimal resolution.
29. With regard to causation of plaintiff's neck condition, Dr. Neave, a neurosurgeon, stated and the Commission finds that plaintiff's accident at work on July 28, 1999 either caused the condition or aggravated a preexisting condition.
30. Dr. Warburton, an orthopedic surgeon, testified that plaintiff appeared to have different symptom complaints in May of 2000, but declined to offer a causation opinion regarding plaintiff's neck condition, instead deferring to Dr. Neave on this issue.
31. With regard to causation of plaintiff's psychological condition, Dr. Goeke, a psychologist, stated that plaintiff's accident at work on July 28, 1999 aggravated a preexisting condition and was a significant causal factor in plaintiff's depression. Likewise, Dr. Lauer, a psychiatrist, stated that plaintiff's accident at work on July 28, 1999 was the primary causal factor of plaintiff's depression.
32. With regard to the need for additional treatment of plaintiff's psychological condition, Dr. Goeke, who last treated plaintiff in May of 2000, testified that he would defer to Dr. Lauer on the need for further treatment. Dr. Lauer stated that plaintiff "needs ongoing psychiatric and psychological treatment fairly extensively in terms of both managing medications and trying different types of anti-depressant medications along with extensive psychotherapy, and by that I mean probably one hour once a week for one to two years." Dr. Lauer further testified that he believes that plaintiff can recover from her psychological injury and return to work, if she receives treatment.
33. With regard to plaintiff's ability to return to work, Dr. Warburton, an orthopedic surgeon, and Dr. Neave, a neurosurgeon, both testified that plaintiff should be able to perform the physical requirements of the greeter position offered by employer-defendant. However, Dr. Lauer, a psychiatrist, stated that as of January 31, 2001, when he last examined plaintiff, she was unable to return to work as a greeter due to her psychological condition. Similarly, Dr. Goeke, a psychologist, stated that as of May of 2000, when he last treated plaintiff, she was probably unable to return to work due to her psychological condition. Greater weight is given to the opinions of Drs. Lauer and Goeke than to Drs. Warburton and Neave on the issue of plaintiff's ability to perform the greeter position.
34. The greater weight of the medical evidence of record establishes that plaintiff's neck condition and psychological condition were caused or aggravated by plaintiff's accident at work on July 28, 1999, that plaintiff has not reached maximum medical improvement for said conditions, and that additional medical and psychological treatment is reasonably required to effect a cure or give relief.
35. The greater weight of the evidence of record establishes that plaintiff did not unjustifiably refuse suitable employment as a greeter and that plaintiff has been temporarily totally disabled due to her psychological condition since her last day of work for employer-defendant on May 3, 2000.
36. Defendant accepted only plaintiff's left shoulder injury as compensable pursuant to a Form 60, and a good faith dispute existed as to the cause of plaintiff's neck condition and psychological condition. Accordingly, defendant did not defend this claim without reasonable ground, and plaintiff did not prosecute this claim without reasonable ground.
 ***********
Based upon the foregoing stipulations and findings of fact the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Implicit in the authority accorded the Industrial Commission to order further medical treatment under N.C. Gen. Stat. § 97-25 is the requirement that the treatment be directly related to the original compensable injury. Pittman v. Thomas Howard, 122 N.C. App. 124,468 S.E.2d 283 (1996). In the instant case, plaintiff has carried the burden of proof to establish that her neck condition and psychological condition are causally related to her injury by accident at work on July 28, 1999. Accordingly, plaintiff is entitled to have defendant pay for medical and psychological expenses previously incurred, and continuing medical and psychological treatment, including pain management, as may be necessary to provide relief, effect a cure, or lessen the period of disability of plaintiff's neck condition and psychological condition. N.C. Gen. Stat. §§ 97-2(19), -25.
2. As a result of the compensable psychological injury, plaintiff is entitled to temporary total disability compensation at the rate of $177.34 per week from May 4, 2000 and continuing until further order of the Commission. N.C. Gen. Stat. § 97-29.
3. As plaintiff is currently entitled to payment of temporary total disability, payment of permanent partial disability is premature. N.C. Gen. Stat. § 97-31.
4. Plaintiff is not entitled to attorney's fees for defendant's alleged defense of this claim without reasonable ground or to a penalty for defendant's alleged failure to pay compensation. Likewise, defendant is not entitled to attorney's fees for plaintiff's alleged prosecution of this claim without reasonable ground. N.C. Gen. Stat. § 97-88.1.
5. Defendant failed to reinstate compensation upon the filing of the Form 28U or to file a Form 24 in violation of N.C. Gen. Stat. §97-18.1 and Workers' Compensation Rule 404A. Defendant's dispute of the causation of plaintiff's neck and psychological condition should have been resolved pursuant to the statutes and Workers' Compensation Rules by filing a Form 24. Defendant is subject to the imposition of sanctions for failure to comply with Commission rules. Workers' Compensation Rule 802.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay for medical and psychological expenses previously incurred, and continuing medical and psychological treatment, including pain management, as may be necessary to provide relief, effect a cure, or lessen the period of disability of plaintiff's neck condition and psychological condition.
2. Subject to the attorney's fee approved below, defendant shall pay temporary total disability compensation to plaintiff at the rate of $177.34 per week from May 4, 2000 and continuing until further order of the Commission. As much of said compensation as has accrued shall be paid in a lump sum.
3. Plaintiff's request for attorney's fees is DENIED.
4. Defendant's request for attorney's fees is DENIED.
5. A reasonable attorney's fee of twenty-five percent of the compensation awarded to plaintiff in paragraph two above is approved to be deducted from sums due plaintiff and paid directly to plaintiff's counsel.
6. Defendant shall pay the costs, including $250.00 to the Commission as sanctions for failing to comply with Commission rules.
This the ___ day of April 2002.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
DISSENTING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER